Edward HUYER, Connie Huyer, Carlos Castro, and Hazel Navas–Castro, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

WELLS FARGO & COMPANY and Wells Fargo Bank, N.A., Defendants.

No. 4:08–CV–00507.

United States District Court,
S.D. Iowa,
Central Division.

Oct. 23, 2013.

Deborah Clark–Weintraub, Joseph P. Guglielmo, Scott & Scott LLP, Jason C. Hardy, Kim E. Richman, Michael R. Reese, Belinda L. Williams, Reese Richman LLP, New York, NY, Roxanne Barton Conlin, Roxanne Conlin & Associates, Des Moines, IA, Sara C. Hacker, Whatley Drake & Kallas LLC, Birmingham, AL, Mario A. Pacella, J. Preston Strom, Jr., Strom Law Firm LLC, Columbia, SC, for Plaintiff.

Elizabeth Holt Andrews, Mark D. Lonergan, Michelle T. McGuinness, Rebecca Snavely Saelao, Michael J. Steiner, John B. Sullivan, Joshua Eric Whitehair, Severson & Werson, San Francisco, CA, Michael A. Giudicessi, Faegre Baker Daniels, LLP, Des Moines, IA, for Defendants.

## ORDER

ROBERT W. PRATT, District Judge.

Before the Court is a motion for class certification ("Motion"), filed November 9, 2012 by Edward Huyer, Connie Huyer (the "Huyers"), Carlos Castro, and Hazel Navas–Castro (the "Castros") (collectively "Plaintiffs"). Clerk's No. 150. Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively "Defendants" or "Wells Fargo") timely resisted the Motion on January 17, 2013. Clerk's No. 156. Plaintiffs replied on February 25, 2013. Clerk's No. 163. On October 2, 2013, the Court held a hearing. *See* Clerk's No. 205. The Motion is fully submitted.

## I. FACTUAL BACKGROUND

Wells Fargo services approximately nine million mortgages.[1] Decl. of Keith Schares ("Schares") in Supp. of Defs.' Br. in Resistance to Pls.' Mot. ("Schares Decl.") (Clerk's No. 158–1) ¶ 2. Wells Fargo's duties in this regard include, but are not limited to, ordering drive-by property inspections for certain delinquent loan accounts. *See id.* ¶ 3. Defendants rely on software called Fidelity Lender Processing Servicing ("Fidelity") to facilitate the ordering of these property inspections. *Id.* ¶ 5. As Wells Fargo's central mortgage database, Fidelity contains data on all serviced mortgages. *Id.* Once a borrower falls behind on her mortgage payments by forty-five days or more, Fidelity automatically orders an initial drive-by inspection of the property securing that mortgage loan. *Id.* ¶ 5, 8. After this initial inspection, Wells Fargo continues to order subsequent inspections every twenty-five to thirty-five days for as long as the borrower remains delinquent.[2] Schares Dep. (Clerk's No. 150–9) at 50:21–51:4.[3] It is this policy of indiscriminately ordering property inspections for all mortgage loans meeting these delinquency criteria that Plaintiffs challenge in this lawsuit. Specifically, they claim that the policy violates both 18 U.S.C. § 1962(c), a provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the California Unfair Competition Law ("UCL").

## II. LAW AND ANALYSIS

### A. *Proposed Classes*

Plaintiffs move for certification of an injunctive relief class, a RICO damages class, and a California UCL class. The proposed injunctive relief class consists of "[a]ll persons who, according to Wells Fargo's records, owe amounts billed by Fidelity ... for drive-by property inspections automatically ordered by Fidelity ... as a result of a late payment of their mortgage." Pls.' Mem. of Law in Supp. of Their Mot. ("Pls.' Br.") (Clerk's No. 150–1) at 7. The proposed RICO damages class is comprised of "[a]ll persons who, according to Wells Fargo's records, paid property inspection fees billed by Fidelity ... for drive-by property inspections automatically ordered by Fidelity ... as a result of a late payment of their mortgage." *Id.* Finally, the proposed California UCL class includes "[a]ll California residents who, according to Wells Fargo's records, paid property inspection fees billed by Fidelity ... for drive-by property inspections automatically ordered by the Fidelity ... system as a result of a late payment of their mortgage." *Id.*

### B. *Class Certification Standard*

■ To grant Plaintiffs' Motion, the Court must find that the proposed classes satisfy the requirements of Rule 23(a), and that they also fit within one of the categories of Rule 23(b). *See* Fed.R.Civ.P. 23(a) & (b). Section (a) of Rule 23 sets forth the four prerequisites for any class action:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Section (b) then lays out the following additional requirements that must be satisfied, depending on the type of class action:

---

1. This data is current as of January 17, 2013. *See* Decl. of Keith Schares in Supp. of Defs.' Br. in Resistance to Pls.' Mot. ("Schares Decl.") (Clerk's No. 158–1) at 6.

2. These subsequent inspections could be suppressed for a variety of reasons "through the use of human intervention in the form of 'flags' and 'stops' applied by personnel throughout ... [the Wells Fargo] enterprise." Schares Decl. ¶ 10. At various times during the period at issue in this litigation, these "stops" and "flags" included contact with the delinquent borrower, foreclosure, loss mitigation efforts, delinquent loans with outstanding balances below a certain threshold, and second mortgages secured by the same property. Expert Report of William G. Hamm, Ph.D. (Clerk's No. 158–14) at 15–16. From January 1, 2012 to November 1, 2012, Wells Fargo ordered 7.7 million inspections while suppressing 5.0 million. Schares Decl. ¶ 10.

3. The page citations refer to the actual deposition pages, not the page numbers that have been automatically generated by CM/ECF, the Court's electronic document filing system.

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

    (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

    (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

In addition, numerous courts have recognized the "implicit" requirement that the class definition must be drafted in such a way as to ensure that membership is ascertainable by some objective standard. *See, e.g., In re Teflon Prods. Liab. Litig.*, 254 F.R.D. 354, 360 (S.D.Iowa 2008) (collecting cases).

■■■ Plaintiffs, as the party moving for class certification, bear the burden of "affirmatively demonstrat[ing] ... [their] compliance with ... Rule [23]." *See Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011); *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Blades v. Monsanto Co.,* 400 F.3d 562, 568 (8th Cir.2005); *Bishop v. Comm. on Prof'l Ethics,* 686 F.2d 1278, 1288 (8th Cir. 1982). A district court has broad discretion in deciding whether a particular action complies with the requirements of Rule 23. *See Wright v. Stone Container Corp.,* 524 F.2d 1058, 1061 (8th Cir.1975) ("The trial court is, of necessity, clothed with a good deal of discretion in determining the appropriateness of a class action." (internal citation omitted)). "However, with great power comes great responsibility; the awesome power of a district court must be 'exercised within the framework of rule 23.'" *Klay v. Humana, Inc.,* 382 F.3d 1241, 1251 (11th Cir.2004) (internal citation omitted); *accord Dukes,* 131 S.Ct. at 2551 ("[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." (internal citations and quotation marks omitted)).

■■■ "'In determining the propriety of a class action, the question is not whether the ... plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.'" *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (quoting *Miller v. Mackey Int'l, Inc.,* 452 F.2d 424, 429 (5th Cir.1971)). "In making the Rule 23 analysis, the substantive allegations in the plaintiff's complaint are accepted as true." *Lockwood Motors, Inc. v. Gen. Motors Corp.,* 162 F.R.D. 569, 573 (D.Minn. 1995) (citing *Jackson v. Rapps,* 132 F.R.D. 226, 230 (W.D.Mo.1990)). Nevertheless, "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action, ... [and] there ... [is][no]thing unusual about that consequence [because] [t]he necessity of touching aspects of the merits in order to resolve preliminary matters, ... [such as] jurisdiction and venue, is a familiar feature of litigation." *Dukes,* 131 S.Ct. at 2552 (internal citations omitted); *accord Elizabeth M. v. Montenez,* 458 F.3d 779, 786 (8th Cir.2006) ("Though class certification is not the time to address the merits of the parties' claims and defenses, the 'rigorous analysis' under Rule 23 must involve consideration of what the parties must prove." (internal citations omitted)). The analysis that follows demonstrates the need for a court "to probe behind the pleadings before coming to rest on the certification question." *Dukes,* 131 S.Ct. at 2551 (internal citation and quotation marks omitted).

## C. *Rule 23(a) Analysis*

Because Defendants' resistance brief is silent with respect to Rule 23(a)'s requirements of numerosity and adequacy, *see generally* Defs.' Br. in Resistance to Pls.' Mot. ("Defs.' Resistance Br.") (Clerk's No. 158), the Court concludes that both of these prerequisites are met in this case, *see* LR 7(e)-(f).[4] Accordingly, the Court will limit its analysis to the Rule's two remaining requirements: commonality and typicality.

### 1. *Commonality.*

■ "Rule 23(a)(2) requires that there be common questions of law or fact among the members of the class." *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 561 (8th Cir.1982). There is no requirement, however, "that every question of law or fact be common to every member of the class," *id.* (internal citations omitted), and indeed, "for purposes of Rule 23(a)(2) even a single common question will do," *Dukes,* 131 S.Ct. at 2556 (internal citation and quotation marks omitted) (alteration removed). To show commonality, Plaintiffs must "demonstrate that the class members have suffered the same injury." *See id.* at 2551 (internal citation and quotation marks omitted). "The common contention of injury 'must be of such a nature that it is capable of class[-]wide resolution—which means that the determination of its truth or

falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Williams v. Wells Fargo Bank, N.A.,* 280 F.R.D. 665, 672 (S.D.Fla.2012) (quoting *Dukes,* 131 S.Ct. at 2551). Therefore, to establish commonality, Plaintiffs must show that Defendants' "course of conduct giving rise to [their] cause[s] of action[, i.e., Wells Fargo's practice of ordering drive-by inspections for properties securing certain delinquent loans,] affects all class members, and that at least one of the elements of th[ose] cause[s] of action is shared by all class members." *See Lockwood Motors, Inc.,* 162 F.R.D. at 575 (citing *Forbush v. J.C. Penney Co., Inc.,* 994 F.2d 1101, 1106 (5th Cir.1993)). Put simply, Plaintiffs need to show that "the [common] question ... linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." *Paxton,* 688 F.2d at 561 (internal citation and quotation marks omitted).

■ Plaintiffs allege that all members of the proposed classes were injured in the same way, i.e., by being charged for drive-by property inspections ordered by Wells Fargo, through its Fidelity software, without any prior determination that these inspections were necessary to protect the lender's interest in the respective property. Relying on the logic employed by the *Williams* court,[5]

---

4. Additionally, the facts of this case support a finding that both of these prerequisites have been met.

5. The relevant passage from *Williams* reads as follows:

> The Plaintiffs argue that all members of the proposed class were injured in the same manner, namely by being charged inflated premiums for the force-placed insurance. [The Defendants] ... argue that although there may be common questions of fact, the answers to those questions will be highly individualized in this matter.... [In other words,] [t]he Defendants argue against class certification on the basis that while there may be common questions to this case, there are no common answers.
>
> The essence of this case, as alleged, is a common scheme to systematically, and without any individual consideration, force-place insurance at an excessive rate to every person whose self-placed property insurance had lapsed. The determination of the truth or falsity of the Plaintiffs' allegations that ... [the Defendants] engaged in a scheme to force-place insurance

> with inflated and excessive premiums will resolve an issue that is central to the validity of each one of the claims in one stroke.
>
> This case is distinguishable from the factual scenario that the Supreme Court addressed in *Dukes* where even if the plaintiffs were able to prove that Wal–Mart's policy had a disparate impact on female employees, each individual plaintiff-employee would still need to establish that she suffered an adverse employment action as a result of that discriminatory policy. Here, the ultimate question of liability is whether the force-placed insurance premiums charged to homeowners were unlawfully inflated and excessive. If they were, that same answer will apply to every plaintiff in the class. There will not be a secondary factual inquiry required, as was the case in *Dukes* .... Accordingly, the Plaintiffs have established that there are questions of law or fact common to the class.

280 F.R.D. at 672 (internal citation omitted).

Plaintiffs argue that the determination of the truth or falsity of this allegation "will resolve an issue that is central to the validity of each class member's claims in one stroke." Pls.' Br. at 10. Defendants disagree that the common contention of injury is capable of class-wide resolution. *See* Defs.' Resistance Br. at 8 (citing *Dukes*, 131 S.Ct. at 2551). In particular, Defendants maintain that whether any given property inspection was necessary can only be determined on a case-by-case basis because the necessity of each challenged inspection depends on the individual borrower's circumstances. *Id.* at 11–12. Therefore, Defendants insist, there is no way to separate the necessary from the unnecessary inspections by referring to "common, class-wide evidence." *Id.* at 11.

Although there can be no doubt that the circumstances surrounding each individual inspection vary on a borrower-by-borrower basis, contrary to Defendants' contention, these differences do not destroy commonality.[6] The Court finds the following two post-*Dukes*[7] decisions instructive—*Ross v. RBS Citizens, N.A.*, 667 F.3d 900 (7th Cir.2012) and *Bouaphakeo v. Tyson Foods, Inc.*, No. 5:07-cv-4009, 2011 WL 3793962, 2011 U.S. Dist. LEXIS 95814 (N.D.Iowa Aug. 25, 2011).[8] The plaintiffs in *Ross* sued their employer, RBS Citizens, N.A. ("RBS"), alleging violations of the Fair Labor Standards Act ("FLSA") and the Illinois Minimum Wage Law. 667 F.3d at 902. After the district court certified the two proposed classes of plaintiffs, RBS filed a timely appeal challenging the certification order. *Id.* at 903–04. RBS argued that the district court had abused its discretion in certifying the classes for two reasons, one of which was that "the two certified classes [failed to] satisfy the commonality prerequisite post-*Dukes*." *Id.* at 904. In concluding that commonality was present, the Seventh Circuit distinguished *Ross* from *Dukes* as follows:

> Despite . . . [RBS]'s best efforts to fit the present case into the *Dukes* mold, there are significant distinctions. . . . In *Dukes*, 1.5 million nationwide claimants were required to prove that thousands of store managers had the same discriminatory intent in preferring men over women for promotions and pay raises. . . . [In contrast,] the plaintiffs' theory [in this case] . . . is that . . . [RBS] enforced an unofficial policy in Illinois denying certain employees overtime pay that was lawfully due. Although there might be slight variations in how . . . [RBS] enforced its overtime policy, both classes maintain a common claim that . . . [RBS] broadly enforced an unlawful policy denying employees earned-overtime compensation. This unofficial policy is the common answer that potentially drives the resolution of this litigation.

*Id.* at 909 (internal citation omitted).

The district court in *Bouaphakeo*, which was also a lawsuit involving allegations of FLSA violations, reached a similar conclusion, i.e., that *Dukes's* "holding[ ] and analysis [on the issue of commonality was] largely inapplicable to and/or distinguishable" from the case before it. *See* 2011 WL 3793962, at *1, 2011 U.S. Dist. LEXIS 95814, at *5.

---

**6.** *Luiken v. Domino's Pizza, L.L.C.*, a recent Eighth Circuit case discussing the requirement of commonality, does not compel a different conclusion. Finding that the certified class did not satisfy the commonality prerequisite, the *Luiken* court reversed the district court's class certification order. *See* 705 F.3d 370, 376–78 (8th Cir. 2013). In that case, the plaintiffs maintained that the common question was whether the delivery charge assessed on every pizza delivery was a gratuity under the applicable Minnesota statute and, therefore, the plaintiffs' property that was illegally retained by the defendant. *Id.* at 373. Under the plain meaning of the statute at issue, however, whether a charge constituted a gratuity depended on how *each individual customer perceived that charge*. *Id.* Because of the statute's language, the Eighth Circuit concluded that com-

monality was destroyed because "the common question was . . . closely tied to the circumstances of each individual plaintiff." *Id.* at 374 (citing *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1031 (8th Cir.2010)). For the reasons contained in this Section, however, the opposite is true of Plaintiffs' common contention of injury in this case.

**7.** The Court begins its analysis with post-*Dukes* decisions because the thrust of Defendants' interpretation of *Dukes* is that it altered the scope and the focus of the commonality analysis.

**8.** Although there are other relevant decisions, the Court finds that limiting its discussion to these two particular cases lends sufficient support to its conclusion.

Accordingly, the court denied the defendant's class decertification motion. *Id.* Notably, *Bouaphakeo* observed that "[a]s *Dukes* was a Title VII case, the focus of the inquiry in resolving each individual's claim was 'the reason for [the] particular employment decision.'" *Id.* at *2–3, 2011 U.S. Dist. LEXIS 95814, at *7–8 (quoting *Dukes,* 131 S.Ct. at 2552). "Unlike *Dukes,* [however, the *Bouaphakeo* court concluded that] there [wa]s a common answer available to th[e] [common] question [of whether the defendant had paid its production workers for all 'work' performed] because, unlike *Dukes,* ... [*Bouaphakeo*] involve[d] a company[-]wide compensation policy that [wa]s applied uniformly throughout [the] defendant's entire ... facility." *Id.* at 3–4, 2011 U.S. Dist. LEXIS 95814, at *11.

Similar to *Ross* and *Bouaphakeo,* this case, too, involves an allegation concerning a policy that was applied uniformly to all class members. Thus, on the authority of these two cases, the common question of whether this policy constitutes a RICO and/or a UCL violation is certainly amenable to a common answer, which will drive the resolution of this litigation. Accordingly, the Court finds, as did the *Ross* and the *Bouaphakeo* courts, that *Dukes* is inapplicable to and/or distinguishable from this case and does not preclude a conclusion that Plaintiffs have shown commonality.

Such conclusion finds additional support in pre–2011 cases, whose holdings and analyses on this issue the Court finds unaffected by *Dukes.* For instance, in *Neal v. Casey,* the Third Circuit held that "class members c[ould] assert ... a single common complaint even if they have not all suffered actual injury [because] demonstrating that all class members [we]re subject to the same harm w[ould] suffice." 43 F.3d 48, 56 (3d Cir. 1994). Similarly, in *Marisol A. by Forbes v. Giuliani,* the Southern District of New York concluded that the "plaintiffs c[ould] establish commonality by demonstrating that all class members [we]re subject to the same harm." 929 F.Supp. 662, 691 (S.D.N.Y.1996), *aff'd,* 126 F.3d 372 (2d Cir.1997). In yet another case—*Foreman v. Heineman*—the

District of Nebraska held that "[w]here the plaintiffs are challenging institutional ... policies and practices, and not their application to each individual member of the class, the fact that each member of the class may be affected differently by the policies does not necessarily preclude a finding of commonality." 240 F.R.D. 456, 503 (D.Neb. 2007). True, none of these pre-*Dukes* cases constitutes binding authority, but the Court finds their analyses applicable and persuasive, and, accordingly, concludes that Plaintiffs have met their burden of demonstrating commonality in this case.

### 2. *Typicality.*

The requirement that the claims of the class representative be typical of the claims of the class is met if there are "other members of the class who have the same or similar grievances as the plaintiff." *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir.1996) (internal citations omitted). A named plaintiff's claim is typical "if the claims ... of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory." *Paxton,* 688 F.2d at 561. The burden of showing typicality is "fairly easily met so long as other class members have claims similar to the named plaintiff['s]." *Alpern,* 84 F.3d at 1540. Moreover, typicality is closely related to commonality and "a finding of one generally compels a finding of the other." *Buycks–Roberson v. Citibank Fed. Sav. Bank,* 162 F.R.D. 322, 333 n. 13 (N.D.Ill.1995) (internal citation omitted); *accord Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ("The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.").

Defendants focus their resistance[9] on the contention that the named Plaintiffs do not

**9.** Relying primarily on *Parke v. First Reliance* *Standard Life Insurance Co.,* 368 F.3d 999 (8th

have standing to bring the two claims asserted in this case.[10] *See* Defs.' Resistance Br. at 14–17. Specifically, Defendants contend that the Castros have no standing to assert either the RICO or the UCL claim because they have not suffered an injury. *Id.* at 15–16. With respect to the Huyers, Defendants argue that they lack standing to maintain the RICO claim because they have not established the requisite causation.[11] *Id.* at 16, 17 ("[T]he Huyers ... have submitted no proof—and have none—that the predicate acts of mail or wire fraud they allege were the but-for or proximate cause of that economic injury.... The Huyers have not established that they paid improper property inspection fees due to their own ... reliance on the purportedly false monthly statements on which they base their ... [RICO] predicate offense claims.").

■ A closer examination of Defendants' standing argument reveals that it concerns statutory, not Article III, standing.[12] *See id.* at 15–17. Applicable case law, including the cases on which Defendants base their standing argument, confirms, however, that the target of the standing inquiry at the class certification stage is Article III, not statutory, standing. *See id.* at 14 (citing *Hall v. LHACO, Inc.*, 140 F.3d 1190, 1196 (8th Cir. 1998) (analyzing Article III standing's "re-

---

Cir.2004), Defendants also assert that Plaintiffs' claims "are atypically individual in nature." Defs.' Resistance Br. at 18. The Court finds no merit in this argument. Indeed, the named Plaintiffs' claims are typical of the class claims because the class members' grievances are virtually identical with those of the named Plaintiffs'—they all contend that they have been the victims of the exact same policy that is at issue in this lawsuit. *See Alpern*, 84 F.3d at 1540. Moreover, concluding that typicality is present in this case is not at odds with the *Parke* holding because *Parke* involved allegations and claims that are markedly different than the ones in the instant case. The plaintiff in *Parke* alleged that the defendant breached its duties under the long-term disability insurance plan at issue by awarding claimants benefits and then terminated those benefits without receiving proof that the claimants' disability status had changed. 368 F.3d at 1004. In light of this allegation, the Eighth Circuit was correct in upholding the district court's finding that typicality was lacking, noting that "while ... [the named plaintiff] may be correct in her argument that ... [the defendant's] termination of benefits before asking for or receiving updated medical records would often constitute a breach of ... [the defendant's] obligations, the question of whether a breach occurred remains a case-by-case determination." *Id.* at 1004–05. This case is in stark contrast to *Parke* because, for reasons already explained, deciding whether Wells Fargo's policy at issue (indiscriminately ordering drive-by property inspections once a particular borrower met certain delinquency criteria) constitutes a RICO and/or a UCL violation would require no case-by-case determinations.

10. "[T]echnically speaking," the issue of standing is separate from the typicality inquiry. *Prado–Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir.2000) ("[I]t is well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative

has Article III standing to raise each class subclaim.").

11. During the hearing on their Motion, Plaintiffs conceded that the Huyers lacked standing to bring the UCL claim.

12. Challenging Plaintiffs' statutory standing amounts to an argument that Plaintiffs cannot prevail on the merits of their claims. *See, e.g., Am. Home Mortg. Corp. v. UM Sec. Corp.*, No. 05 Civ. 2279, 2007 WL 1074837, at *2, 3, 2007 U.S. Dist. LEXIS 26670, at *8, 10 (S.D.N.Y. Apr. 9, 2007) (stating that "RICO standing is not a jurisdictional issue but rather is part of the merits analysis" and further noting that "[t]o satisfy RICO's standing requirements, a plaintiff must demonstrate (1) a violation of 18 U.S.C. § 1962, (2) injury to business or property, and (3) causation of the injury by the violation." (internal citations and quotation marks omitted)). Defendants have cited no legal authority—and the Court has found none—justifying such an inquiry into the merits of Plaintiffs' claims at the class certification stage. *See Eisen*, 417 U.S. at 178, 94 S.Ct. 2140 (observing that at the class certification stage, "the question is not whether ... the plaintiffs ... will prevail on the merits, but rather whether the requirements of Rule 23 are met" (internal citation and quotation marks omitted)). Furthermore, to the extent that the Court should examine the statutory standing issue at this stage of the litigation, it must accept all allegations in the Complaint, including those pertaining to statutory standing, as true. *Walsh v. Principal Life Ins. Co.*, 266 F.R.D. 232, 239 (S.D.Iowa 2010) (" 'In making the Rule 23 analysis, the substantive allegations in the plaintiff's complaint are accepted as true.' " (quoting *Lockwood Motors, Inc.*, 162 F.R.D. at 573)). Since the Complaint adequately pleads all elements of the RICO and UCL causes of action, *see* Third Am. Compl. (Clerk's No. 119) ¶¶ 98–107, the Court must conclude, at this stage of the litigation, that statutory standing is present.

dressability" element and concluding that the plaintiff has no standing to pursue his claim because it "simply is not redressable against . . . [the defendant]"), *Alpern*, 84 F.3d at 1539 (citing *Gen. Tel. Co. of the Sw.*, 457 U.S. at 156, 102 S.Ct. 2364 (noting that the named plaintiffs must have suffered the same injury as the class members)), *E. Tex. Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 403–04, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) ("[The named plaintiffs] could have suffered no injury as a result of the alleged discriminatory practices, and they were, therefore, simply not eligible to represent a class of persons who did allegedly suffer injury.") (cited in *Falcon*, 457 U.S. at 156, 102 S.Ct. 2364 & *Shapiro v. Midwest Rubber Reclaiming Co.*, 626 F.2d 63, 71 (8th Cir.1980)), & *Prado–Steiman v. Bush*, 221 F.3d 1266, 1279–80 (11th Cir.2000) ("[I]t is well-settled that prior to the certification of a class, . . . the district court must determine that at least one named class representative has Article III standing to raise each class [ ]claim. . . . [E]ach claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." (internal citation and quotation marks omitted))); *see also Avritt*, 615 F.3d at 1034 ("The irreducible constitutional minimum of standing requires a showing of injury in fact to the plaintiff that is fairly traceable to the challenged action of the defendant, and likely to be redressed by a favorable decision." (internal citation and quotation marks omitted)); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir.2006) ("[Article III standing] is the threshold question in every federal case, determining the power of the court to entertain the suit. . . . The filing of suit as a class action does not relax this jurisdictional requirement."); *Aho v. Americredit Fin. Servs.*, No. 10cv1373, 2011 U.S. Dist. LEXIS 80426, at *29–30 (S.D.Cal. July 25, 2011) (concluding that class members at the class certification stage need only comply with

"Article III's less stringent [standing] requirements" because "[n]oticeably absent from Article III" are the UCL statutory standing "requirement[s] of an injury . . . [and] causation tethered to loss of money or property"). Accordingly, the Court will construe Defendants' standing argument as a challenge to Plaintiffs' Article III, not their statutory, standing.

■ Thus construed, Defendants' argument cannot withstand scrutiny. The Court finds that the Castros have suffered an injury-in-fact within the meaning of Article III, regardless of whether they have actually paid some portion of the assessed property inspection fees or have merely been assessed, but are yet to pay, such fees. *See Denney*, 443 F.3d at 264–65 (noting that "[a]n injury-in-fact may simply be the fear or anxiety of future harm," and, thus, concluding that "[t]he future-risk members of the . . . class have suffered injuries-in-fact, irrespective of whether their injuries are sufficient to sustain any cause of action"); *Aho*, 2011 U.S. Dist. LEXIS, at *32 ("Being subject to an invalid debt satisfies Article III standing requirements."); *White v. Trans Union, L.L.C.*, 462 F.Supp.2d 1079, 1084 (C.D.Cal. 2006) (concluding that "[t]he perpetration of [c]redit [r]eports containing inaccurate . . . information regarding 'due and owing' debts is a sufficient injury to grant [the] [p]laintiffs standing" to seek injunctive relief under the UCL). The Court also concludes that the injury allegedly suffered by the Huyers was caused, or is "fairly traceable,"[13] to the challenged practice of ordering property inspections for certain delinquent mortgage loans. *See Sierra Club v. Browner*, 843 F.Supp. 1304, 1311 (D.Minn.1993) ("The 'fairly traceable' . . . requirement[ ] for Article III standing ensure[s] that the injury is caused by the challenged activity. . . ."). Therefore, Defendants' standing argument must fail.

### D. *Rule 23(b) Analysis*

As noted, *supra*, in addition to finding that the requirements of Rule 23(a) have been

---

**13.** Although the "fairly traceable" component of the Article III standing inquiry is only a portion of the causation requirement, *see Allen v. Wright*, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("The 'fairly traceable' and 'redressability' components of the constitutional

standing inquiry were initially articulated by this Court as 'two facets of a single causation requirement.' " (internal citation omitted)), the Court finds this distinction impertinent to its causation inquiry.

satisfied, the Court must also find that the proposed classes fit within one of the categories set forth in Rule 23(b). Plaintiffs move to certify the injunctive relief class under Rule 23(b)(2) and the RICO and UCL classes under Rule 23(b)(3). The Court will examine these two Rule 23(b) categories in turn.

### 1. *Rule 23(b)(2).*

Defendants claim that Plaintiffs' proposed injunctive relief class should not be certified for "at least [the following] three reasons:" (1) "[P]laintiffs do not allege a claim on which injunctive relief may be recovered"; (2) *Dukes* prohibits the "severing [of] . . . [Plaintiffs'] claims in two [and] obtaining (b)(2) certification for . . . [the] [i]njunctive [r]elief [c]lass . . . and (b)(3) certification for the[ ] RICO and UCL classes insofar as they seek damages"; and (3) the proposed injunctive relief class in not cohesive. Defs.' Resistance Br. at 18–23.

### a. *Availability of injunctive relief.*

Defendants concede that the UCL allows injunctive relief, but assert that "neither the named [P]laintiffs nor the proposed (b)(2) class may seek relief under that statute" because they lack standing to bring the UCL claim. Defs.' Resistance Br. at 19–20. For the reasons set forth in § II.C.2 of this Order, however, the Court has determined that one of the two named Plaintiffs—the Castros—have Article III standing to maintain that claim. Thus, the Castros can seek injunctive relief on behalf of the injunctive relief class for Wells Fargo's alleged violations of the UCL.

While it undisputed that injunctive relief is provided for under the UCL, whether such a remedy is also available to private-party civil RICO claimants is far from certain. As Defendants point out, "the Eighth Circuit[ [14]] has not addressed the question." Defs.' Resistance Br. at 19. Relying on *Religious Technology Center v. Wollersheim,* 796 F.2d 1076, 1080–89 (9th Cir.1986), Defendants insist, however, that "the prevailing view is that no injunctive relief is recoverable in a

civil RICO action," and urge the Court to adopt this "prevailing" position. *Id.* The relevant portion of the *Wollersheim* opinion reads as follows:

> Section 1964 has four parts. Part (c) was added late in RICO's legislative passage through Congress. The bill passed by the Senate included only the present parts (a), (b), and (d).
>
> . . .
>
> Part (a) is a broad grant of equitable jurisdiction to the federal courts. Part (b) permits the government to bring actions for equitable relief. Part (d) grants collateral estoppel effect to a criminal conviction in a subsequent civil action by the government. Part (c), the private civil RICO provision, states that a private plaintiff may recover treble damages, costs and attorney's fees. In contrast to part (b), there is no express authority to private plaintiffs to seek the equitable relief available under part (a).
>
> Admittedly, part (c) also does not expressly limit private plaintiffs "only" to the enumerated remedies, nor does part (a) expressly limit the availability of the illustrative equitable remedies to the government. However, the inclusion of a single statutory reference to private plaintiffs, and the identification of a damages and fees remedy for such plaintiffs in part (c), logically carries the negative implication that no other remedy was intended to be conferred on private plaintiffs.
>
> As the Supreme Court has emphasized, Congress expressly admonished that RICO "be liberally construed to effectuate its remedial purposes," and that "the statute's 'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity." In this spirit, those sympathetic to a private equitable remedy under civil RICO have suggested two other readings of the statute. The [injunctive relief proponent] urges us to adopt either or both of these constructions of section 1964.

---

**14.** The Eighth Circuit has hinted that injunctive relief may be available in the context of a civil RICO claim, but has expressly declined to decide

the issue. *See Bennett v. Berg,* 685 F.2d 1053, 1064 (8th Cir.1982).

First, the [injunctive relief proponent] suggests that it is significant that the treble damage clause of section 1964(c) is preceded by "and" rather than "to." Thus, it is suggested, all appropriate relief, including the equitable remedies of part (a), are available to private plaintiffs because there is no clear statutory limitation. Moreover, the [injunctive relief proponent] argues, there is no good reason for Congress denying victims equitable relief while permitting them damages relief. No court has accepted this reading.

. . .

Second, the [injunctive relief proponent] asserts that the variation in language used in parts (a) and (b) of section 1964 indicate that Congress did not intend to limit the inherent powers of federal courts to grant equitable relief in suitable cases. The argument is made that because part (b) grants the Attorney General the express power to seek temporary equitable relief, other parties are permitted to seek permanent equitable relief. Moreover, the [injunctive relief proponent] contends, if the availability of equitable relief under section 1964 were determined solely by part (b), part (a) would become superfluous.

The [injunctive relief proponent] develops this textual argument with particular vigor. It argues that part (a), alone of the subparts of section 1964, is general in theme and apparently unrestricted in application. Its plain words place no limit on the class or category of litigants who might avail themselves of the remedies it makes available under RICO. While the other subparts of section 1964 provide for specific relief to specific parties, the [injunctive relief proponent] observes that they give no indication that part (a) is anything other than a simple and broad grant of jurisdiction. The [injunctive relief proponent] reads section 1964(b) as permission for the government to secure injunctive relief without satisfying the traditional equity tests of irreparable harm and inadequacy of alternative remedy at law. Thus, the [injunctive relief proponent] asserts, part (b) does not restrict RICO injunctive relief to the government, but merely sets aside for civil RICO cases the traditional rule

that only a victim may enjoin a crime. Thus, the . . . [injunctive relief proponent] would have us read part (a) as sufficient for a federal court to grant an injunction to a private RICO plaintiff even if part (c) had never been added to section 1964.

This latter construction of section 1964 is certainly a plausible reading of the statutory language.

*Id.* at 1082–84 (internal citations omitted). Having concluded that the statutory language at issue is ambiguous, the Ninth Circuit undertook a review of § 1964's legislative history, *id.* at 1084–86, and concluded that "injunctive relief is not available to a private party in a civil RICO action," *id.* at 1084.

Only one other court of appeals has squarely addressed this issue. In *National Organization of Women, Inc. v. Scheidler,* the Seventh Circuit concluded that injunctive relief is an available remedy, thus expressly rejecting both the reasoning and the holding of *Wollersheim.* 267 F.3d 687, 698 (7th Cir. 2001), *rev'd on other grounds,* 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003). The logic underlying the *Scheidler* holding is as follows:

Congress explicitly provided for injunctive relief in § 1964(a), although it did not specify in that section which plaintiffs can seek such relief. Given that the next two sections describe two types of plaintiffs, the government and private plaintiffs, and spell out additional remedies specific to each type, we find that the only logical conclusion is that Congress intended the general remedies explicitly granted in § 1964(a) to be available to all plaintiffs. Although we would be confident resting our holding purely on the plain text of § 1964, we note that our interpretation is consistent with Congress's admonition that the RICO statute is to be liberally construed to effectuate its remedial purposes.

267 F.3d at 698 (internal citation and quotation marks omitted). Concluding that it need not look further for support of its holding than the plain language of § 1964, the Seventh Circuit nevertheless proceeded to undercut the Ninth Circuit's reliance on the

statute's legislative history. *See id.* at 699. The Seventh Circuit began its criticism by noting that *Wollersheim* relied on two "snippets" of legislative history representing two instances where "Congress was ... presented with the opportunity ... to include a provision [expressly] permitting private plaintiffs to secure injunctive relief," but on both occasions declined to do so. *Id.* (citing *Wollersheim,* 796 F.2d at 1086). Then, the Seventh Circuit opined that these two "snippets of legislative history [can hardly] amount to the kind of clearly expressed legislative intent to the contrary that ... [the Seventh Circuit] would require [in order] to cast doubt on unambiguous statutory language." *Id.* (internal citation and quotation marks omitted). Additionally, the Seventh Circuit listed two more reasons for discounting *Wollersheim's* holding. First, it noted that *Wollersheim* itself conceded that certain portions of the statute's legislative history actually support the contrary conclusion, i.e., that injunctive relief is available to private-party civil RICO claimants. *Scheidler,* 267 F.3d at 699 (citing *Wollersheim,* 796 F.2d at 1085). Second, it pointed out that, based on post-*Wollersheim* U.S. Supreme Court precedent, refusals to enact amendments to a statute represent the "type of legislative history [that] is a particularly thin reed on which to rest the interpretation of a statute." *Id.* (citing *Solid Waste Agency of N. Cook Cnty. v. United States Army Corps of Eng'rs,* 531 U.S. 159, 169–70, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) & *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 187, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994)).

◼ Although a majority of courts to address the issue of the availability of injunctive relief to private-party civil RICO plaintiffs have followed *Wollersheim,* thus concluding that injunctive relief is unavailable, the Court cannot agree that this is the prevailing view.[15] Indeed, it is impossible to discern whether these courts chose to follow the Ninth Circuit's position simply because for fifteen years *Wollersheim* was the only pronouncement on this issue[16] or because the Ninth Circuit's logic is more persuasive than the Seventh Circuit's.[17] Even though both Circuits advocate their respective positions quite persuasively, the Court finds the Seventh Circuit's *Scheidler* analysis compelling, and, accordingly, holds that injunctive relief is available to private-party civil RICO claimants. By so holding, the Court joins at least two other district courts that chose to follow *Scheidler* over *Wollersheim. See In re Managed Care Litig.,* 298 F.Supp.2d 1259, 1283 (S.D.Fla.2003) ("[T]he Court will follow the persuasive interpretation of the ... *Scheidler* decision ... as it appropriately tracks the plain language of the statute.... [D]istrict courts [should] not ... consult legislative history ... when the plain meaning is clear.") & *Motorola Credit Corp. v. Uzan,* 202 F.Supp.2d 239, 243–44 (S.D.N.Y.2002) (endorsing the *Scheidler* holding, but for a different reason, i.e. that since § 1964 does not expressly deny courts the power to grant injunctive relief in private civil actions, which "is one of the equitable powers given to federal courts by the Judiciary Act of 1789, ... the normal presumption favoring a court's retention of all powers granted by the Judiciary Act ... prevails").

### b. *Rule 23(b)(2) and Dukes.*

◼ Defendants argue that *Dukes* prohibits Plaintiffs from severing the injunctive relief prayer from the monetary one and seeking class certification of the injunctive relief class under Rule 23(b)(2) and monetary relief classes under Rule 23(b)(3) because thus circumventing "[*Dukes's* ] holding

---

**15.** It is axiomatic that when only two appellate courts have addressed a given issue and have taken diametrically opposite positions on that issue, there can be no prevailing view.

**16.** It is certainly within the realm of possibility that courts facing this issue post *Wollersheim* but before *Scheidler* chose to follow *Wollersheim* simply because there was no legal authority advocating the contrary position.

**17.** At least one court seems to take this latter position. *See Minter v. Wells Fargo Bank, N.A.,* 593 F.Supp.2d 788, 795 (D.Md.2009) ("Faced with such a split, this Court finds that the Ninth Circuit provides a more well-reasoned and convincing argument [than the Seventh Circuit].").

[would reduce it] to a nullity." Defs.' Resistance at 20. The Court cannot agree, and its position is bolstered by the fact that several courts facing this precise issue have rejected the restrictive interpretation of *Dukes* urged by Defendants. *See Jermyn v. Best Buy Stores, L.P.,* 276 F.R.D. 167, 173–74 (S.D.N.Y.2011) (explaining that *Dukes* only held that class certification under Rule 23(b)(2) of classes seeking both injunctive and monetary relief, "where the monetary component was more than merely 'incidental' to the injunctive relief," was "inconsistent with the history and structure of the rule," but did not prohibit certifying an injunctive relief class under Rule 23(b)(2) and separately certifying a monetary damages class under Rule 23(b)(3)); *Stinson v. City of New York,* 282 F.R.D. 360, 381 (S.D.N.Y.2012) (applying the *Jermyn* reasoning in the context of a 42 U.S.C. § 1983 claim); *Bristol Vill., Inc. v. La.-Pac. Corp.,* 916 F.Supp.2d 357, 370 (W.D.N.Y.2013) ("*Dukes* does not preclude certifying a class under Rule 23(b)(2) and *separately* certifying a class under Rule 23(b)(3) for non-trivial monetary damages."); *see also Nationwide Life Ins. Co. v. Haddock,* 460 Fed.Appx. 26, 28–29 (2d Cir.2012) (remanding for consideration of class certification under Rules 23(b)(3) and 23(b)(2) where non-incidental, individualized monetary damages were sought along with injunctive relief, thus implicitly rejecting Defendants' interpretation of *Dukes* ); *Gooch v. Life Investors Ins. Co. of Am.,* 672 F.3d 402, 428 n. 15, 429 (6th Cir.2012) (noting that "certifying [a] declaratory relief [class] under Rule 23(b)(2) is permissible even ... [though] the declaratory relief serves as a predicate for later monetary relief, which would be certified under Rule 23(b)(3)" because each member of the class "would be entitled to an individualized award of monetary damages" (internal citation and quotation marks omitted)). Therefore, for the reasons stated in these cases, *Dukes* does not preclude certifying the injunctive relief and monetary relief classes under Rules 23(b)(2) and (b)(3), respectively.

c. *Rule 23(b)(2) cohesiveness.*

█ A class action is maintainable under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." "Although Rule 23(b)(2) has no predominance or superiority requirements, [as does Rule 23(b)(3),] the rule does include an implicit 'cohesiveness' requirement, which precludes certification when individual issues abound." *In re St. Jude Med., Inc.,* No. 01–1396, 2003 WL 1589527, at *14, 2003 U.S. Dist. LEXIS 5188, at *48 (D.Minn. Mar. 27, 2003) (internal citation and quotation marks omitted). This "cohesiveness" requirement is easily met, however, in cases where, as in this case, the class members were subject to the very practice or policy of the defendant that is being challenged in the lawsuit. *See Jefferson v. Ingersoll Int'l Inc.,* 195 F.3d 894, 897 (7th Cir.1999) (noting that there is no doubt "Rule 23(b)(2) is well[-]suited to pattern-or-practice suits"); *DeBoer v. Mellon Mortg. Co.,* 64 F.3d 1171, 1175 (8th Cir.1995) (concluding that since "the class sought such injunctive relief against Mellon's alleged over-escrowing practices, ... certification under section (b)(2) was appropriate"); *Smith v. United HealthCare Servs., Inc.,* No. 00–1163, 2002 WL 192565, at *5, 2002 U.S. Dist. LEXIS 2140, at *15–16 (D.Minn. Feb. 5, 2002) (finding class certification under Rule 23(b)(2) appropriate where the plaintiffs sought injunctive and declaratory relief to remedy an "alleged [ ] course of conduct by ... [the defendant] that was 'generally applicable' to the proposed class"); *Bublitz v. E.I. du Pont de Nemours & Co.,* 202 F.R.D. 251, 259 (S.D.Iowa 2001) ("Courts have certified ERISA classes pursuant to Rule 23(b)(2) where the plaintiffs alleged a course of conduct that was generally applicable to the class."). Some differences among the class members are expected within any injunctive class, but this alone does not defeat cohesiveness. *See Jefferson,* 195 F.3d at 897–98 (discussing the use of Rule 23(b)(2) in an employment discrimination case where the factual differences between differentially situated plaintiffs may allow for differential damages); *cf. Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 143 (3d Cir.1998) (observing

that class certification under Rule 23(b)(2) is inappropriate if *"significant* individual issues ... pervade the entire action ... [and] arise consistently" and proceeding to conclude that there were *"too many* individual issues to permit certification" (emphasis added)).

■ Applying this legal framework to the facts of this case convinces the Court that the proposed injunctive relief class is cohesive. All members of this class have been subjected to the same policy of ordering drive-by property inspections for borrowers meeting certain delinquency criteria. *See* Schares Decl. ¶ 3. Indeed, it is undisputed that, during the period at issue in this lawsuit, Wells Fargo has applied this policy to all serviced mortgage loans. *See id.* ¶¶ 3, 8, 11. Unquestionably, the injunctive relief class members are not identically situated, but whatever the differences among them may be, they are neither "significant," nor "too many." *See Barnes,* 161 F.3d at 143. Accordingly, the Court concludes that the injunctive relief class is cohesive.

2. *Rule 23(b)(3)'s predominance requirement.*[18]

■ Rule 23(b)(3) requires that common questions of law or fact "predominate over any questions affecting only individual members" and that resolving the matter as a class action be "superior to other available methods for the fair and efficient adjudication of the controversy."[19] *Amchem Prods., Inc.,* 521 U.S. at 615, 117 S.Ct. 2231. The predominance requirement " 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.' " *Blades v. Monsanto Co.,* 400 F.3d 562, 566 (8th Cir.2005) (quoting *Amchem Prods., Inc.,* 521 U.S. at 623, 117 S.Ct. 2231). "The predominance inquiry requires an analysis of whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member." *Halvorson v. Auto–Owners Ins. Co.,* 718 F.3d 773, 778 (8th Cir.2013) (citing *Avritt,* 615 F.3d at 1029); *accord Novak v. Home Depot U.S.A., Inc.,* 259 F.R.D. 106, 114 (D.N.J.2009) (holding that to satisfy predominance, the party seeking certification must "show that the essential elements of the cause of action are capable of proof through evidence that is common to the class, rather than evidence that is unique to each individualized class member"). Thus, "[i]f, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to

**18.** The dissent in *Dukes* criticizes the majority for elevating the commonality inquiry to a level reserved for the predominance inquiry, thus casting doubt on the exact scope of this latter inquiry. *See Dukes,* 131 S.Ct. at 2566 (Ginsburg, J., dissenting) ("The Court's emphasis on differences between class members mimics the Rule 23(b)(3) inquiry into whether common questions 'predominate' over individual issues.... 'The Rule 23(b)(3) predominance inquiry' is meant to 'tes[t] whether proposed classes are sufficiently cohesive to warrant adjudication by representation.' If courts must conduct a 'dissimilarities' analysis at the Rule 23(a)(2) stage, no mission remains for Rule 23(b)(3)." (internal citation omitted)). At least one commentator shares the dissent's concerns. *See* Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure,* 88 N.Y.U.L. REV. 286, 319–20 (2013) *"(Dukes* ... has increased the burden of showing 'significant proof' of a general policy of discrimination in order to secure class certification. It did so by insisting on a showing of a higher level of 'commonality' under Rule 23(a)(2) than previously thought necessary by requiring that class members 'have suffered the same injury' and that the common questions be 'capable of classwide resolution' and 'central to the validity of each one of the claims in one stroke.' Nothing in the language of Rule 23(a)(2), the provision's history, or prior jurisprudence justifies these limitations."). The majority in *Dukes,* however, insists that:

> [t]he dissent misunderstands the nature of the ... [commonality] analysis ... [in arguing] that we have "blend[ed]" Rule 23(a)(2)'s commonality requirement with Rule 23(b)(3)'s inquiry into whether common questions 'predominate' over individual ones. That is not so.... We consider dissimilarities ... in order to determine (as Rule 23(a)(2) requires) whether there *is* "even a single [common] question."

131 S. Ct. at 2556 (internal citations omitted). However meritorious the dissent's concerns may be, the majority opinion in *Dukes*—not the dissent—constitutes binding legal authority. Accordingly, the Court must conclude that *Dukes* did not redefine the parameters of either the commonality or the predominance requirements.

**19.** Since Defendants do not challenge Rule 23(b)(3)'s superiority requirement, and the facts of this case support such a finding, the Court concludes that it has been met. *See* LR 7(e)-(f).

member, then it is an individual question." *Avritt,* 615 F.3d at 1029 (quoting *Blades,* 400 F.3d at 566); *cf. Comcast Corp. v. Behrend,* —— U.S. ——, 133 S.Ct. 1426, 1433, 185 L.Ed.2d 515 (2013) ("[Because] respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis, ... [q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."). "If, [on the other hand,] the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Avritt,* 615 F.3d at 1029 (quoting *Blades,* 400 F.3d at 566). In determining "whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, ... so ... as to determine whether, given the factual setting of the case, if the plaintiffs general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Blades,* 400 F.3d at 566 (internal citations omitted).

██ Defendants argue that the RICO and UCL classes fail to meet this predominance requirement for the following three reasons. First, Plaintiffs cannot show by "common evidence ... [that] the property inspections and fees at issue were uniformly unreasonable and inappropriate." Defs.' Resistance Br. at 24–25. In other words, Defendants maintain that Plaintiffs must do more than show "that Wells Fargo applied a uniform practice to them." *Id.* at 24. Second, the RICO claim requires individual proof of reliance, thus eliminating the possibility "to make out a prima facie case for the class" by common evidence.[20] *Id.* at 25 (citing *In re Zurn Pex Plumbing Prods. Liab. Litig.,* 644 F.3d 604, 619 (8th Cir.2011) (internal quotation marks omitted)). Third, Defendants contend, with respect only to the UCL claim, that since "resulting harm [is]

... [a] required element[ ] of a UCL claim brought in federal court," all members of the class must have standing to bring the suit in their own right. *Id.* at 26–27. For reasons that follow, the Court finds that Rule 23(b)(3)'s predominance requirement has been met in this case.

### a. *Reasonableness of each individual inspection.*

Defendants' assertion that it is simply impossible to establish by evidence common to the whole class that each individual property inspection was unreasonable and, therefore, not authorized by the respective mortgage note is, by itself, probably an accurate statement. What this assertion ignores, however, is that Plaintiffs need not make such a showing to prevail on their claims in this lawsuit. Indeed, Defendants' assertion plainly misstates Plaintiffs' main allegation in this case, thus indirectly transforming the RICO and UCL causes of action into breach-of-contract claims. The motivation is quite obvious: If Defendants persuade the Court to focus its predominance inquiry on the differing circumstances of each class member, it would be likely impossible to conclude that the predominance requirement is met. *See Halvorson,* 718 F.3d at 779–80 (holding that whether the defendant insurance company breached its contracts with the policyholder plaintiffs by utilizing the claim processing methodology at issue "necessitate[d] individual fact inquiries for each member of the class," thus destroying predominance). The Court, however, is not persuaded by Defendants' argument.

Indeed, unlike in *Halvorson,* Plaintiffs in this case allege that the challenged policy of indiscriminately ordering drive-by property inspections violates both RICO and the UCL, not that it breaches the mortgage note con-

---

**20.** Although Defendants seem to maintain that the UCL claim also requires an individualized showing of reliance, they fail to cite any legal authority for that proposition, and, indeed, fail to develop that argument at all. *See* Defs.' Resistance Br. at 26 "(*Both of [P]laintifs' claims* require proof of reliance, and [P]laintiffs have suggested no means of proving reliance by common evidence; hence, their claims are not amenable to class certification." (emphasis added)). In

fact, there is legal authority for the contrary position. *See In re Tobacco II Cases,* 46 Cal.4th 298, 93 Cal.Rptr.3d 559, 207 P.3d 20, 35 (2009) ("[C]ourts [have] repeatedly and consistently ... h[e]ld that relief under the UCL is available without individualized proof of deception, reliance and injury."). Therefore, the Court will confine its discussion of Defendants' reliance argument to the RICO claim.

tracts between Plaintiffs and their respective mortgagees.[21] This distinction is critical, for there can be little doubt that whether the challenged policy constitutes a RICO and/or a UCL violation can be established by common evidence and requires no examination of the individual circumstances of each class member. *See Klay v. Humana, Inc.,* 382 F.3d 1241, 1257 (11th Cir.2004) ("[T]he very gravamen of the RICO claims is the 'pattern of racketeering activities'.... These are not facts from which jurors will be asked to infer the commission of wrongful acts against individual plaintiffs; these very facts constitute essential elements of each plaintiff's RICO claim[ ].... Thus, while corporate policies [a]re only circumstantially relevant in ... discrimination [or breach-of-contract] cases, and insufficient to overcome the tremendous individualized issues of fact ... in those cases, they constitute the very heart of the plaintiffs' RICO claims here ...."); *but see Halvorson,* 718 F.3d at 780 ("Answering the question of whether Auto–Owners's claim processing methodology breached its contract [with each individual class member] under North Dakota law necessitates individual fact inquiries for each member of the class[, which destroys predominance].."). Consequently, the Court finds that, given the nature of Plaintiffs' allegations and causes of action, there would be no need to prove whether any particular property inspection was unreasonable.

### b. *Reliance.*

Defendants' second argument concerning predominance, i.e., that the RICO claim requires individualized proof of reliance by each class member, which eliminates the possibility of proving the elements of this claim by common evidence, is also unavailing.[22] The Court's position finds support in a recent Second Circuit case—*In re U.S. Foodservice Pricing Litigation,* 729 F.3d 108 (2d Cir.

2013). In that case, the court held that "payment ... may constitute circumstantial proof of reliance upon a financial representation." 729 F.3d at 119–20. Specifically, the court reasoned that "payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed." *Id.* at 119–20 (citing *Klay,* 382 F.3d at 1259). Although not binding on the Court, *In re U.S. Foodservice Pricing Litigation* makes a compelling case that, in this lawsuit, the civil RICO claim's reliance element may be established by circumstantial evidence applicable to the class as a whole—the payment of the amounts shown in class members' mortgage statements, which amounts included property inspection fees. The Court finds *In re U.S. Foodservice Pricing Litigation's* logic persuasive and, accordingly, adopts its holding.

### c. *Standing.*

To the extent that this standing argument amounts to an assertion that some class members within the proposed UCL class lack Article III standing, the Court has already rejected it. *See supra* § II.C.2. The Court, however, understands this Article III standing argument to be a bit more nuanced. Rather than simply arguing that some UCL class members may not possess Article III standing, Defendants assert that the need to examine each class member's individual circumstances to determine whether he or she has standing to pursue the UCL claim destroys predominance. *See* Defs.' Resistance Br. at 27 n.21 (citing *O'Shea v. Epson Am., Inc.,* No. CV 09–8063, 2011 WL 4352458, at *7–8, 2011 U.S. Dist. LEXIS 105504, at *23 (C.D.Cal. Sept. 19, 2011) ("[Q]uestions of Article III standing amount to an inquiry as to whether individual issues of injury-in-fact

---

**21.** If Plaintiffs were alleging that Wells Fargo's policy at issue constituted a breach of the mortgage note contracts between them and their respective mortgagees, Plaintiffs would have certainly named these mortgagees as defendants, especially in light of the fact that Wells Fargo services millions of mortgages on behalf of other lending institutions and is not a party to those mortgage note contracts.

**22.** The Court need not define the precise contours of the required showing of reliance by a private civil RICO plaintiff; rather, it will assume, as Defendants contend, that individualized reliance must be shown.

and causation predominate over common issues[.]")).

In *O'Shea*, the court concluded that satisfying "Article III's [standing] requirements . . . defeat[ed predominance] . . . [because] individualized issues of injury and causation permeate the class claims." 2011 WL 4352458, at *10, *12, 2011 U.S. Dist. LEXIS 105504, at *30, 37. *O'Shea* is inapposite, however. Admittedly, "to establish standing under Article III, each class member [i]s required to show that they suffered some injury as a result of [Wells Fargo's policy at issue]." *Id.* at *10, 2011 U.S. Dist. LEXIS 105504, at *30 (citing *Webb v. Carter's Inc.,* 272 F.R.D. 489, 503–04 (C.D.Cal.2011)). For reasons that follow, however, in this case, unlike in O'Shea, Article III standing is capable of proof on a class-wide basis.

Defendants seem to contest only the injury-in-fact and the "fairly traceable" requirements of Article III standing. *See* Defs.' Resistance Br. at 26–27 ("[P]ersons who did not suffer economic injury by relying on the defendant's alleged misstatements cannot bring a UCL suit themselves. . . ."). With respect to the injury-in-fact element, Plaintiffs can easily establish, on a class-wide basis, that Wells Fargo's policy of ordering drive-by property inspections was applied uniformly to all members of the proposed UCL class and resulted in the assessment of property inspection fees. The assessment of these property inspection fees, even if not paid, constitutes an injury-in-fact for Article III standing purposes. *See supra* pp. 12–16. Demonstrating that this injury is "fairly traceable" to Defendants' policy at issue can also be accomplished with evidence common to the entire class. After all, it can hardly be disputed that the injury-in-fact (the assessment of property inspection fees) was caused by Wells Fargo's practice of ordering drive-by property inspections for certain delinquent mortgage loans. Therefore, despite the class members' differing circumstances, common questions predominate over any "individual [Article III] standing issues of *'particularized injury and causation.'*" *See Aho,* 2011 U.S. Dist. LEXIS 80426, at *29–30 (agreeing that all class members, including absent ones, must have Article III standing

to bring the UCL claim, but rejecting the defendant's assertion that "individual standing issues of *'particularized injury and causation.'* will predominate over common issues . . . because such an argument ignored applicable law requiring that class members at the class certification stage only comply "with Article III's less stringent requirements [of] an injury that is . . . fairly traceable to the defendant's conduct" rather than with the "UCL['s statutory] standing requirements . . . of both injury and *particularized* causation").

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification (Clerk's No. 150) is GRANTED.

IT IS SO ORDERED.